## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

David Meza,

       Plaintiff,

v.

Union Pacific Railroad Co.,

       Defendant.

Case No.

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff David Meza ("Meza") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended ("ADA")

### PRELIMINARY STATEMENT

1.       Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even where the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removed the employees disclosing these conditions from service. Union Pacific then subjected the employees to a Fitness-for-Duty evaluation, again regardless of whether the employee had been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is fit for duty and Union Pacific does not conduct physical evaluations. Furthermore, it routinely disregards the opinions of

outside doctors who provide physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," falsely determining that the employee is unfit for duty, or issuing unnecessary work restrictions which it then refuses to accommodate.

2.      In February 2016, several Union Pacific employees commenced a class action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The district court of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3.      Meza is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified and safely performing his job without incident, Meza was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific on the basis of his disability. Meza was a putative class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5.      Venue is proper under 28 U.S.C. § 1391(b)(1), because defendant is headquartered in Omaha, Nebraska.

6.      Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because

employment records relevant to defendant's unlawful employment practices are maintained and administered in Omaha, Nebraska, and because Union Pacific's principal office is in Omaha Nebraska.

## THE PARTIES

7.      Meza resides in Hemet, California. He was an employee of Union Pacific, working in Bloomington, California.

8.      Union Pacific is a railroad carrier engaged in interstate commerce and has operations in Bloomington, California, and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9.      Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10.     The medical rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels as "Reportable Health Events" (Exhibit A.) This includes but is not limited to any loss of consciousness no matter what the duration.

11.     Union Pacific's Fitness-for-Duty program is even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of

3

their jobs, simply because Union Pacific learns that the employee has, or has had in the

past, certain other, non-listed health conditions, or because a manager refers an employee

to Health and Medical Services for a Fitness-for-Duty evaluation.

12.     When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

13.     These Fitness-for-Duty evaluations are not individualized assessments of

the employee's ability to safely perform the essential functions of the employee's job.

14.     Union Pacific routinely disregards the opinions of the employee's treating

doctor who has physically examined the employee and instead makes broad requests for

medical information, including medical records, from the employee.

15.     Once Union Pacific receives the medical information, Union Pacific's

Health and Medical Services Department, located in Omaha, Nebraska and at the time

headed by Chief Medical Officer Doctor John Holland, conducts a "file review" and issues

a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with

restrictions, or unfit for duty

16.     Union Pacific's Health and Medical Services Department routinely issues

Fitness-for-Duty determinations that disqualify employees from their positions on the basis

4

of their disabilities, even though the disabilities do not affect the employee's ability to safely perform the essential functions of their jobs.

17.     When issuing these Fitness-for-Duty determinations, the Health and Medical Services department relies on standardized protocols for employees with certain health conditions or treatments in order to assign standardized work restrictions on employees.

18.     As part of these standardized protocols, the Health and Medical Services Department relied on the Federal Motor Carrier Administration ("FMCSA") 2014 Medical Examiner's Handbook ("The 2014 Medical Examiner's Handbook"), which the company downloaded from the FMSCA website in March 2014, to determine which health conditions required work restrictions, and to determine how long those restrictions should be imposed.

19.     Union Pacific's Chief Medical Officer Doctor John Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

20.     The recommendations contained in the 2014 Medical Examiner's Handbook, however, do not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

21.     In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications.

22.     By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website, and it was no longer endorsed for use.

5

23. Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMSCA medical certification requirements.

24. Union Pacific also represented to Courts that the 2014 Medical Examiner Handbook was reliable guidance and supported its decisions to impose standardized work restrictions for its employees:

a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Defendant's Brief in Response to Plaintiff's Motion for Class Certification, *Harris et. al v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261.

b. "In 2014 the FMCSA issued a *Medical Examiner Handbook* (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018 at 18, *Harris et. al v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No 249-16.

c. "Since 2014, Union Pacific has relied on the FMSCA guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Declaration of Dr. John Holland, October 2, 2018, *Harris et. al v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

d. "The 10 years off antiseizure medication and seizure-free is identical to the Federal Motor Carrier Safety Administration's (FMCSA) Advisory Criteria for commercial drivers with epilepsy. The FMCSA's Advisory Criteria is intended to help medical examiners in determining whether a driver meets the physical qualifications for commercial driving. Def's Brief in Support of Motion to Exclude Testimony of Dr. Kevin Trangle*, Kevin Taylor v. Union Pacific Railroad Co.*, 8:20-cv-00314-JFB-SMB, ECF No. 374 (internal citations and quotations removed).

    e.   "As this Court held in *Witchet*, employers may rely on their own physicians and FMCSA guidelines to make this sort of reasonable, safety-based medical judgment about an employee who drives commercial vehicles. As a result, each of Miller's ADA claims should be dismissed." Defendant's Brief in Support of Motion for Summary Judgment, *Miller v. Union Pacific Railroad Co.*, 8:20-cv-00311-JFB-SMB, ECF No. 380.

25.    On information and belief, Union Pacific never informed any Court addressing the legality of its Fitness for Duty program that the FMCSA removed the handbook from its website, or that the 2014 Handbook was no longer endorsed for use by the FMCSA.

26.    As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many have lost their livelihoods.

### *PLAINTIFF DAVID MEZA.*

27.    Meza was hired by Southern Pacific Railroad in 1996 as a carman doing repair and car inspector work. Soon after, Union Pacific purchased Southern Pacific Railroad, at which time Meza continued to work as a carman doing the same work.

28.    Over his 20-year career, Meza worked ably for the company as a carman doing repairman work and car inspector work.

29.    Most recently, Meza worked as a carman doing car inspector work in Bloomington, California.

30.    On June 18, 2016, Meza was injured in a motorcycle accident.

31.    Meza lost consciousness, incurred physical injuries including a skull fracture, and was later diagnosed with a traumatic brain injury ("TBI").

32.    Meza was temporarily unable to work and took time off to recover.

7

33.     On January 12, 2017, Meza's treating neurologist determined that Meza's symptoms related to the head injury were resolved, that Meza had "made a full recovery" and that Meza could "return to work on February 1, 2017, and resume his regular job duties."

34.     On January 19, 2017, Meza's chiropractor determined that Meza "recovered sufficiently to return to full work duty, without restrictions."

35.     Despite these clearances, in a "Fitness-for-Duty Determination" memorandum dated March 1, 2017, Union Pacific Associate Medical Director John Charbonneau stated that Meza "will require sudden incapacitation restrictions for a period of five years."

36.     Dr. Charbonneau further stated in the March 1, 2017 memorandum that Meza's restrictions were consistent with recommendations from the Federal Motor Carrier Safety Administration ("FMCSA").

37.     On March 3, 2017, Chief Medical Officer Dr. John Holland signed a Railroad Retirement Board form stating Meza "has been disabled from performing his/her regular occupation from June 18, 2016 (Date) to June 18, 2021 (Date) due to the following condition(s): TBI – Skull Fy."

38.     In a letter dated March 10, 2017 and signed by Roger D. Lambeth, Jr., Union Pacific stated Meza had been "medically cleared to work" with "permanent restrictions, effective March 3, 2017" but that the restrictions "cannot be accommodated."

39.     The restrictions listed in the March 10, 2017 letter were as follows: (1) Operation of company vehicles/on-track or mobile equipment/fork-lifts—Prohibited; (2) Operation of cranes, hoists, or machinery—Prohibited; (3) Work requiring critical decision

8

making—Prohibited; (4) Work without adherence to HMS protocol—Prohibited; (5) Work at unprotected heights over 4 feet above the work surface—Prohibited; (6) If a new job assignment is considered, then HMS should review the functional job demands to determine if you can safely perform the essential functions of the job; (7) Not to perform work where decisions or actions can affect the safety of others, or have a significant impact on business operations; and (8) Not to perform work involving active control of trains or equipment.

40.     Around that same time, Meza spoke with his manager, Paul Friend, about the company-imposed restrictions and continuing to work in his carman position or in any other capacity for the company. Friend informed Meza that he could not.

41.     In a letter dated March 13, 2017 and signed by Terry Owens, Union Pacific further informed Meza that his "supervising department has been unable identify a reasonable accommodation" and enclosed a document entitled, "What are my options now that I am unable to return to my railroad job?"

42.     At no time during this process, or after, did Dr. Holland, Dr. Charbonneau, or any other doctor affiliated with Union Pacific physically examine Meza.

43.     Nevertheless, Meza continued to cooperate with the company in an effort to return to his job as a carman/car inspector, or in another position with the company, either through the lifting of the company restrictions or an accommodation of those restrictions.

44.     On March 13, 2017, Meza's treating physician, a Federal Aviation Administration ("FAA") Medical Examiner, cleared Meza to return to work with no restrictions.

9

45.     On June 19, 2017, another neurologist who physically examined Meza again cleared him to work with no restrictions.

46.     Soon after receiving the June 19, 2017 clearance, Meza sent a letter to Union Pacific asking again for the company to allow him to "return to work with Union Pacific Railroad." Meza never heard back from Union Pacific.

47.     As a result of Union Pacific's treatment, Meza concluded it would be fruitless to continue to seek accommodations from Union Pacific either in his position as a carman/car inspector, or in any other position with the company.

48.     In the time since, Union Pacific has persisted in its refusal to allow Meza to return to his job, including after the five-year period of the company-imposed work restrictions fully elapsed.

49.     Meza remains capable of working in his position to this day

50.     On February 19, 2016, counsel for Meza, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska.  *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

51.     Because he was a putative class member in the *Harris* case, Meza's disability discrimination claims have been subject to tolling during the pendency of litigating the class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

52.     This court certified the class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

53.     As a result of *Crown Cork* tolling, Meza had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Meza's and other putative class members' claims by an additional sixty (60) days. Meza timely filed a charge of discrimination with the EEOC on April 17, 2020. On March 15, 2022, the EEOC issued a right-to-sue letter. Meza now timely initiates the present lawsuit.

## CAUSES OF ACTION

### COUNT I
### *VIOLATIONS OF THE ADA*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

54.     The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

55.     At all relevant times, Meza was an individual with a disability under the ADA.

56.     At all relevant times, Meza had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position, with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

57.     Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation,

11

job training, and other terms, conditions, and privileges of employment.

58.     Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

59.     Union Pacific discriminated against Meza on the basis of disability.

60.     Because Union Pacific violated 42 U.S.C. § 12112, Meza has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Meza is also entitled to attorneys' fees and costs incurred in connection with these claims.

61.     Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Meza. As a result, Meza is entitled to punitive damages.

**COUNT II**
*VIOLATIONS OF THE ADA*
*DISABILITY DISCRIMINATION—DISPARATE IMPACT*

62.     Meza is a qualified individual with a disability under the ADA.

63.     Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business

necessity." 42 U.S.C. § 12112(b)(6).

64.    Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria or methods of administration . . . that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3).

65.    Union Pacific discriminated against Meza on the basis of disability.

66.    Union Pacific's Fitness-for-Duty policies and practices disproportionately—and adversely—impacted qualified individuals with disabilities.

67.    Union Pacific uses qualification standards that screen out and tend to screen out individuals with disabilities.

68.    Union Pacific cannot show that such qualification standards are job-related and consistent with business necessity.

69.    Because Union Pacific violated 42 U.S.C. § 12112, Meza has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Meza is also entitled to attorneys' fees and costs incurred in connection with these claims.

70.    Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Meza. As a result, Meza is entitled to punitive damages.

## COUNT III
### VIOLATIONS OF THE ADA
### FAILURE TO ACCOMODATE

71.    Meza is a qualified individual with a disability under the ADA.

72.    Discriminating against a qualified individual with a disability includes:

[N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an

13

applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

. . . denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant[.]

42 U.S.C. § 12112(b)(5)(A), (B).

73.     Union Pacific discriminated Meza by failing to provide him and reasonable accommodation and by terminating his employment.

74.     Because Union Pacific violated the ADA, Meza has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Meza is also entitled to attorneys' fees and costs incurred in connection with these claims.

75.     Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of meza. As a result, Meza is entitled to punitive damages

### **PRAYER FOR RELIEF**

**WHEREFORE, Meza prays for judgment against Union Pacific as follows:**

1.  That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2.  An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3.  For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4.      Pre-judgment interest, as provided by law;

5.      For Meza's costs, disbursements and attorneys' fees pursuant to law;

6.      For an award of punitive damages;

7.      For all relief available under the ADA;

8.      For such other and further relief available by statute; and

9.      For such other and further relief as the Court deems just and equitable.


Date: March 22, 2022                    **NICHOLS KASTER, PLLP**

                                        s/Neil D. Pederson
                                        James H. Kaster (MN # 53946)
                                                kaster@nka.com
                                        Neil D. Pederson* (MN # 0397628)
                                                npederson@nka.com
                                        80 South Eighth Street
                                        4700 IDS Center
                                        Minneapolis, Minnesota 55402-2242
                                        Telephone: (612) 256-3200
                                        Fax: (612) 338-4878

                                        **ATTORNEYS FOR PLAINTIFF**