IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAVID MEZA,<br><br>                Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD CO.,<br><br>                Defendant. | 8:22CV102<br><br>MEMORANDUM<br>AND ORDER |

      This matter is before the Court on defendant Union Pacific Railroad Co.'s ("Union Pacific") Motion for Summary Judgment (Filing No. 137) pursuant to Federal Rule of Civil Procedure 56 and Nebraska Civil Rule 56.1. Plaintiff David Meza ("Meza") contends genuine disputes of material fact make summary judgment improper in this case (Filing No. 149). For the reasons stated below, Union Pacific's motion is granted.

## I.    BACKGROUND[1]

      In about 1996, Meza started working as a carman for the Southern Pacific Railroad. After it merged with Union Pacific, he worked for Union Pacific in a railyard in West Colton, California. Over his twenty-five years with Union Pacific, he has held a number of different jobs, including car inspector, carman welder, and lead carman.

      At the time most relevant to this case, Meza was working as a car inspector, which involves inspecting, maintaining, and repairing railcars in the railyard, often with moving trains nearby. An essential function of his job was ensuring the safety of himself and his coworkers. The presence of large moving and rotating equipment in the railyard creates a potentially dangerous working environment that can result in serious injury or death if employees are not alert and vigilant. Meza acknowledges his job was a safety-sensitive

---

      [1]The background is primarily drawn from the parties' respective statements of undisputed facts and responses (Filing Nos. 139, 148, and 155).

position but counters that awareness, experience, and well-established safety policies and procedures significantly helped mitigate the risk of working in the railyard. By all accounts, Meza did his job well.

On June 18, 2016, Meza was involved in an off-duty motorcycle accident, during which he was thrown from the bike and lost consciousness for at least two minutes. He was then taken by ambulance to a hospital, where he received care until June 26. During his stay, Meza had several brain scans that showed he sustained serious injuries. He was diagnosed with an intracerebral hemorrhage (bleeding into the brain tissue), a subdural hematoma (blood in the spaces around the brain), and a basilar skull fracture.

Meza also suffered other medical issues after the accident, including dizziness, memory loss, and vertigo. By the time Meza was discharged, his intracerebral hemorrhage had "improved" and was "stable." He was told to follow up with his primary physician in four to six weeks and to be off work for six weeks.

On July 26, 2016, Meza followed up with Dr. Robert Klein ("Dr. Klein"), a general neurologist at the BMG Banning Specialty Care Center – Neurology in Banning, California. Dr. Klein physically examined Meza and ordered magnetic resonance imaging ("MRI") of his brain, which was performed on August 9, 2016. Dr. Klein found "no specific or acute intracranial abnormality," "[n]o specific brain parenchymal abnormality," and no hemorrhage, mass effect, or edema.

During a follow-up visit on January 12, 2017, Dr. Klein determined Meza had "made a full recovery." He noted Meza's neurological exam was normal and that testing for dizziness was negative. Dr. Klein cleared Meza to "return to work on February 1, 2017, and resume his regular job duties." Union Pacific points out Dr. Klein was not aware Meza had suffered an intracerebral hemorrhage and did not account for it when he cleared him. Meza was also cleared to return to work by his chiropractor and physical

therapist, who helped Meza recover from his dizziness and vertigo. Union Pacific again emphasizes that those releases did not relate to Meza's intracerebral hemorrhage.

Shortly after Meza's accident, Union Pacific placed him on a medical leave of absence. Before it would let him return to work, Union Pacific required him to undergo a fitness-for-duty evaluation. Dr. John Charbonneau, a Union Pacific Associate Medical Director and an experienced occupational physician, led the evaluation. To facilitate the review, Meza provided medical records and the work releases from his treating providers. Union Pacific did not arrange to physically examine Meza as part of that process.

In conducting fitness-for-duty evaluation for a safety-sensitive job like Meza's, Union Pacific relied on the Federal Motor Carrier Safety Administration's ("FMCSA") 2014 Medical Examiner Handbook ("Handbook"), which was designed to assist medical examiners in determining whether commercial truck drivers are medically qualified to drive safely. According to Union Pacific, the Handbook provides medical recommendations and guidelines that "are evidence-based by relying on a systematic review of the available scientific literature, expert analyses of data, and recommendations from Medical Expert Panels."

Union Pacific reports it began using the Handbook in evaluating risks of sudden incapacitation in response to recommendations from the National Transportation Safety Board ("NTSB") to the Federal Railroad Administration ("FRA") "and individual railroads to adopt comprehensive medical standards and requirements for employees in safety-sensitive positions." According to Union Pacific, the FRA failed to adopt such standards despite recognizing the risk "potentially incapacitating medical conditions" like seizure disorders present to railroad employees, the railroads, and the public.[2] Union

---

[2]Meza acknowledges the FRA never adopted universal standards but blames Union Pacific and other railroads for dooming those efforts, both to save money and maintain control. Noting the FMCSA removed the Handbook from its website for revisions in 2015, Meza also contends the Handbook has been abandoned as guidance because it is outdated and was being misused. In Meza's view, it is not a proper basis for

3

Pacific notes the NTSB and FRA have indicated the FCMSA guidelines can be helpful in setting standards for railroad workers in certain circumstances.

As pertinent here, the Handbook directs examiners to disqualify a driver who "has a medical condition that endangers the health and safety of the driver and the public." The recommendations for intracerebral and subarachnoid hemorrhages parallel those for strokes—with a longer waiting period (five years) before returning to work if the employee is at an increased risk for seizures because they suffered cortical and subcortical deficits. Union Pacific asserts "an intracerebral hemorrhage" like Meza's warrants the five-year wait, particularly when, given Meza's duties and the dangerous railyard environment, a loss of consciousness could result in a serious accident.

In February 2017, based in part on those guidelines and Meza's medical records, Dr. Charbonneau, issued a fitness-for-duty decision for Meza. He concluded "due to the nature and severity of [Meza's] traumatic brain injury with" intracerebral hemorrhaging, Meza required the following sudden-incapacitation restrictions for five years:

1. Not to operate company vehicles, on-track or mobile equipment, or forklifts. (Clarification: not to operate golf carts, ATVs, etc.).

2. Not to work on or near moving trains, freight cars or locomotives, unless protected by barriers. (Clarification: May work on stationary locomotives outside of the blue flag zone, if working with another employee and following normal safety rules).

3. Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.

4. Not to work at unprotected heights, over 4 feet above the ground. (Clarification: May ascend stairs and ladders on locomotives in shops, following normal safety rules).

5. Not to perform work where decisions or actions can affect the safety of others, or have a significant impact on business operations.

---

decision for those and other reasons. Union Pacific maintains it is a scientifically valid and valuable resource.

      6.      Not to perform work involving active control of trains or equipment (e.g., Train Dispatcher or Yard Master positions).

Meza's work restrictions were to "remain in place until at least 6/18/2021 and then [could] be reassessed." Dr. Charbonneau did not examine Meza or speak to him or any of his medical providers before recommending those restrictions. He also did not seek an outside opinion from a neurologist or epileptologist. Union Pacific's then-Chief Medical Officer, Dr. John Holland ("Dr. Holland"), agreed that Meza presented an unacceptable risk of sudden incapacitation as a result of his traumatic brain injuries.

In March 2017, Dr. Charbonneau contacted Meza by phone to explain Union Pacific's fitness-for-duty determination. He told him Union Pacific wanted to prevent Meza from being in situations where a sudden-incapacitation event like a seizure could lead to a workplace accident or injury. Meza protested the decision, asserting he had fully recovered from the motorcycle accident and was ready and able to return to work.

Union Pacific sent Meza's medical restrictions to Paul Friend ("Friend"), Manager of Mechanical Maintenance at the West Colton railyard, and Roger Lambeth ("Lambeth"), the General Superintendent. Although Friend had no concerns about Meza's basic ability to do his job based on his experience, Friend and Lambeth decided Meza's restrictions interfered with his ability to perform the essential functions of his "car inspector position and that no reasonable accommodations were available." Meza questions Friend's and Lambeth's qualifications to evaluate accommodations and denies he needed the comprehensive medical restrictions Union Pacific imposed, but he agrees that he could not do the job of a car inspector with them in place.

Meza did not give up. Later that month, he forwarded Union Pacific a release from his primary-care provider, Dr. Katrina Platt ("Dr. Platt"), that indicated he could return to work with no restrictions. Meza also sought a "second opinion" from neurologist and epileptologist Dr. Pantea Zohrevand ("Dr. Zohrevand"), who was aware

5

of Meza's brain injuries and evaluated whether he could return to work from a neurological and seizure perspective. Dr. Zohrevand ordered an electroencephalogram, which was normal, and another MRI, which led her to conclude Meza was at an increased risk of seizure but could safely return to work without restrictions. She provided a work release for Meza on June 19, 2017. Union Pacific again questions the validity of Meza's additional releases based on a lack of records provided in discovery and what it sees as each provider's failure to consider all the risks Meza returning to work in the railyard.

Despite the additional information from Meza, Union Pacific did not change its decision. Dr. Charbonneau said he didn't alter the fitness-for-duty determination because "the facts of the injury and previous structural findings" were not challenged, "only the resultant actions." With the restrictions still in place, Meza remained unable to return to work, even though he maintains he could have safely returned as soon as March 2017.

The five-year restriction period lapsed in July 2021. During discovery, one of Meza's physician experts testified it would have been reasonable and appropriate for Meza to return to work after two years of being seizure free, agreeing that there is an increased risk of seizure following the injury but disagreeing on the duration of the risk.

Although Meza vigorously contested his restrictions when Union Pacific imposed them, there is no indication in the record he tried to get them adjusted or removed in the years that followed. He did, however, contact Union Pacific immediately after the restrictions lapsed. Union Pacific advised him he needed a comprehensive neurological evaluation before he could return to work. Meza was unable to comply because did not have medical insurance and could not afford the requisite testing.

On March 22, 2022, Meza filed this suit against Union Pacific (Filing No. 1), alleging unlawful discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended as by the ADA Amendments Act of 2018 ("ADAAA"), 42 U.S.C. § 12101 *et seq.* He amended his pleading a few weeks later (Filing No. 8),

asserting two causes of action: disparate treatment under § 12112(a) and disparate treatment (unlawful screening) under § 12112(b)(6).

In its answer (Filing No. 13), Union Pacific asserted eighteen affirmative defenses, including that Meza "posed a direct threat to the health and safety of himself, his coworkers, the public, and/or others that could not be eliminated by reasonable accommodation, and [Union Pacific] made an objectively reasonable medical decision regarding [Meza]." It also moved to dismiss the second count for failure to state a claim (Filing No. 14), *see* Fed. R. Civ. P. 12(b)(6), which the Court granted (Filing No. 46).

In May 2022, Union Pacific again advised Meza he needed a neurological exam before he could be reinstated. Able to test this time, Meza submitted the results to Union Pacific in September 2022. Dr. Laura Gillis ("Dr. Gillis"), Union Pacific's new Chief Medical Officer, reviewed Meza's updated medical records, including the neurological examination from his treating provider, and determined he was "medically cleared" to return to work full duty. In reaching her decision, she found it important that Meza never suffered a seizure. With the restrictions gone, Meza returned to work.

Meza's return to work did not end the parties' dispute. As the case moved forward, Union Pacific moved to exclude some proffered testimony from Meza's expert witness regarding the FMCSA's decision to remove the Handbook from its website (Filing No. 117). After careful review, the Court denied (Filing No. 136) the motion, concluding the proffered opinion might help the jury and "should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).

On October 5, 2023, Union Pacific moved for summary judgment on Meza's remaining ADA claim and its direct-threat defense. Union Pacific contends Meza's claim fails because "he cannot prove *intentional disability discrimination*." *See, e.g.*,

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) (explaining that a disparate-treatment claim requires evidence of the employer's "subjective intent to discriminate") (quotation omitted)). Meza contends the motion "should be denied in its entirety."

## II.     DISCUSSION

### A.     Standard of Review

In deciding a motion for summary judgment, the Court generally "views the record in the light most favorable to the nonmoving party" and draws all reasonable inferences supported by the evidence in their favor. *Broadway Ford Truck Sales, Inc. v. Depositors Ins. Co.*, 88 F.4th 746, 749 (8th Cir. 2023); *Johnson v. Midwest Div. - RBH, LLC*, 88 F.4th 731, 736 (8th Cir. 2023) (clarifying that facts are "viewed in the light most favorable . . . only if there is a genuine dispute at those facts." (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc))). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A disputed fact is material when it "might affect the outcome of the" case, and a dispute is genuine when "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *Greater St. Louis Constr. Laborers Welfare Fund v. B.F.W. Contracting, LLC*, 76 F.4th 753, 757 (8th Cir. 2023) (quoting *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998)). The summary-judgment "standard does not allow [courts] to 'weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Oien v. Home Depot U.S.A., Inc.*, 69 F.4th 487, 490 (8th Cir. 2023) (quoting *Pritchett v. Cottrell, Inc.*, 512 F.3d 1057, 1062 (8th Cir. 2008)).

To survive summary judgment, the nonmoving party need not "prove its case." *Hill v. Sw. Energy Co.*, 858 F.3d 481, 487 (8th Cir. 2017). But in responding to a properly supported summary-judgment motion, he "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at

1042 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to create a triable issue; "there must be evidence on which the jury could reasonably find for the plaintiff." *Nelson v. Lake Elmo Bank*, 75 F.4th 932, 937 (8th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Absent that, summary judgment is required. *See Matsushita*, 475 U.S. at 587.

### B. Disability Discrimination

The ADA prohibits covered employers like Union Pacific "from discriminating against employees on the basis of disability." *Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th Cir. 2023) (citing 42 U.S.C. § 12112(a)). Meza "bears the burden" of proving he is disabled.[3] *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 (8th Cir. 2007).

A person is disabled under the ADA if they have "a physical or mental impairment that substantially limits one or more major life activities," have "a record of such an impairment," or are "regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the ADAAA, the term "disability" is to be construed broadly. *Id.* § 12102(4); *see also Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 804 (8th Cir. 2014) (explaining the ADAAA made "it *easier* to prove a disability" but did "not *absolve* a party from proving one" (emphasis in original) (quoting *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013))).

The implementing regulations define "physical or mental impairment" to mean (1) "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive,

---

[3]Of course, Union Pacific bears the burden of proving its direct-threat defense. *See EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007). Obtaining summary judgment on such a defense is not easy to do. *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so.").

genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine" and (2) "[a]ny mental or psychological disorder, such as an intellectual disability[,] . . . organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h); 42 U.S.C. § 12116.

"To prove a claim of disability discrimination, an employee may rely on either direct or indirect evidence." *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021). Though often misconstrued as the antithesis of circumstantial evidence, in this context, "direct evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)). In other words, the adjective "'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Id.* "Direct evidence includes 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude,' where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)).

Relatively speaking, direct evidence of unlawful employment "discrimination is rare." *EEOC v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir. 2002), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043, 1059 app.; *see also Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir. 1996) (observing that "smoking-gun" cases and "'eyewitness' testimony as to the employer's mental processes'" will be rare in employment-discrimination cases "because a shrewd employer will not leave a trail of direct inculpatory evidence for the plaintiff to bring into court" (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983))). To make sure

10

employees alleging unlawful discrimination have a reasonable chance at their day in court, courts permit them to "establish an inference of discrimination . . . under the burden-shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973)." *Anderson*, 78 F.4th at 1036; *accord Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence.") (internal marks and quotation omitted).

Under that framework, the employee can shift the burden of production to the employer by establishing a prima facie case of disability discrimination. *Anderson*, 78 F.4th at 1036. That requires the plaintiff to demonstrate "(1) he is a disabled person as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability." *Id.* (quoting *Higgins v. Union Pac. R.R.*, 931 F.3d 664, 669 (8th Cir. 2019).

If the employer proffers "a legitimate, nondiscriminatory reason for" its actions, "[t]he burden then shifts back to the [employee] 'to show that the proffered reason was, in reality, a pretext for discrimination.'" *Id.* at 1036-37 (quoting *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016)). Whether relying on direct evidence or creating a reasonable inference under *McDonnell Douglas*, the employee always bears "the ultimate burden" of establishing that he "has been the victim of intentional discrimination." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

Here, Meza agrees that he only "proceeds under the 'regarded as' prong of the" ADA definition of disability. "Under the ADA, an employee is 'regarded as having . . . an impairment' if he" shows that his employer subjected him to a prohibited action

11

"'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Canning v. Creighton Univ.*, 995 F.3d 603, 614-15 (8th Cir. 2021) (quoting 42 U.S.C. § 12102(3)(A)).

In other words, "a person is regarded as disabled if [his] employer mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities or mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Id.* at 615. "Because the employer's motive and intent are at the heart of a discrimination case, the central inquiry is whether" an actual or perceived "disability was a factor in the employment decision *at the moment it was made*." *See Anderson*, 78 F.4th at 1039 (internal marks omitted) (quoting *Wal-Mart Stores, Inc.*, 477 F.3d at 570)).

Meza contends Union Pacific regarded him as disabled and unlawfully discriminated against him by imposing "broad work restrictions against [him] that resulted in the loss of his job." According to Meza, Union Pacific "removed [him] from service because it believed his traumatic brain injury and intracranial hemorrhage meant that he would pose a risk to himself or others if he were suddenly to lose consciousness."

Union Pacific strikes at the heart of that claim—denying Meza has adduced any colorable evidence that Union Pacific regarded him as disabled when it imposed the restrictions. Though the analysis is often far from easy, Union Pacific's argument is relatively straightforward. Noting that the parties agree that Meza faces a greater risk of seizures as a result of his brain injury, Union Pacific draws a distinction "between an employer's belief that an employee has a physical impairment versus a predisposition to future health risks."

Union Pacific contends it restricted Meza's work activities based on his elevated risk of seizures in the future, not because of the underlying brain injury in the past—an injury Meza states he recovered from by the time his doctors released him to return to

12

work. Thus, Union Pacific argues it did not regard Meza as disabled—that is, suffering from a present physical or mental impairment—when it imposed the restrictions.

In support, Union Pacific relies on *Morriss v. BNSF Railway Co.*, 817 F.3d 1104, 1106, 1113 (8th Cir. 2016), in which a failed applicant for employment at a railroad brought a disparate-treatment claim against the railroad alleging it "discriminated against him because it perceived him has having a physical impairment," namely, obesity. In affirming summary judgment for the railroad, the Eighth Circuit clarified "the plain language of the ADA prohibits actions based on an existing impairment or the perception of an existing impairment" but "does not prohibit discrimination based on a perception that a physical characteristic—as opposed to a physical impairment—may eventually lead to a physical impairment" under the ADA. *Id.* at 1113 (explaining "the ADA does not prohibit an employer from acting . . . on its assessment that although no physical impairment currently exists, there is an unacceptable risk of a future physical impairment").

Union Pacific also draws on some recent cases in which it has found some success with similar arguments. *See, e.g.*, *Bingham v. Union Pac. R.R.*, No. 8:22-CV-118, 2023 WL 6196875, at *12-*13 (D. Neb. Sept. 22, 2023); *Jackson v. Union Pac. R.R.*, No. 419CV00069RGERAW, 2021 WL 1726895, at *14-*15 (S.D. Iowa Mar. 29, 2021). For example, in *Jackson*, a track laborer who suffered a stroke alleged Union Pacific regarded him as disabled and discriminated against him in violation of the ADA by putting him on work restrictions for five years. *See Jackson*, 2021 WL 1726895, at *14.

Opining that "an employer does not 'regard' an employee as disabled when the employer's adverse action is based on belief that the employee cannot perform the job," the district court found Jackson had failed "to present sufficient evidence to suggest Union Pacific regarded him as disabled when it placed him on a five-year waiting period with work restrictions." *Id.* (citing *Fischer v. Minneapolis Pub. Sch.*, 792 F.3d 985, 989-90 (8th Cir. 2015)). Based in part on Union Pacific's "concerns about Jackson's ability

13

to safely perform his job due to the increased risk of sudden incapacitation its doctors associated with his stroke," the district court concluded the "decision to issue work restrictions and a five-year waiting period [did] not indicate Union Pacific believed Jackson *had* a physical impairment; instead, it showed "Union Pacific believed Jackson was *at risk* of becoming physically impaired and creating a safety hazard while performing his job." *Id.*

Union Pacific points out the district court further found Union Pacific's willingness "to reevaluate Jackson after the five-year waiting period and reinstate him as a track laborer" indicated "Union Pacific did not regard Jackson as having a physical impairment." In the district court's view, "Union Pacific believed Jackson's risk of sudden incapacitation rendered him unqualified to safely perform his job for a period of time." *Id.* at *14-*15. In granting summary judgment, the *Jackson* court reasoned, "Because Union Pacific believed Jackson was unqualified to perform his job duties due to his risk of sudden incapacitation, Jackson [could not] demonstrate Union Pacific regarded him as physically disabled when it issued work restrictions for a five-year waiting period." *Id.* at *15.

Another judge on this Court relied on *Jackson* in reaching the same conclusion in *Bingham*, 2023 WL 6196875, at *1-*2, *13-*15. After Bingham, a track inspector, suffered a stroke, Union Pacific imposed five years of work restrictions based on its safety concerns. *Id.* at *9. Bingham alleged disability discrimination and argued Union Pacific regarded him as disabled because he suffered a brain injury. *Id.* at *12.

Agreeing with the logic in *Jackson*, the Court determined, as even Bingham acknowledged, "the workplace restrictions which eventually led to his job loss were not based on a 'current' impairment (whether actual or perceived), but instead on Union Pacific's 'assessment that although no physical impairment currently exists, there is an unacceptable risk of a future physical impairment.'" *Id.* at *13 (quoting *Morriss*, 817 F.3d at 1113). The Court concluded that Union Pacific's action "based on its concern

14

that Bingham was predisposed to suffering a future, sudden incapacitating event" was "permissible under the ADA" because it did not indicate Union Pacific believed he had an existing impairment when it imposed the restrictions. *Id.*

In addition to *Morriss* and *Jackson*, the Court drew insight from the reasoning of other circuit courts that have analyzed similar issues under the ADA. *Id.*; *see also Darby v. Childvine, Inc.*, 964 F.3d 440, 446 (6th Cir. 2020) (deciding "a genetic mutation that merely predisposes an individual to other conditions, such as cancer, is not itself a disability under the ADA"); *Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 335-36 (7th Cir. 2019) (holding that "the ADA's 'regarded as' prong" does not cover "a situation where an employer views an applicant as at risk for developing a qualifying impairment in the future"); *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 923 (9th Cir. 2018) (concluding the statutory text of § 12102(3)(A), "which prohibits discrimination on the basis of an 'actual or perceived impairment' in the present tense," supported the parties' agreement that an employer must have regarded an employee "as having a current impairment" to have regarded him "as having a disability" under the ADA). In particular, the Court agreed with the Seventh Circuit that if an "impairment does not yet exist, it can be neither actual nor perceived." *Bingham*, 2023 WL 6196875, at *12 (quoting *Shell*, 941 F.3d at 336).

Union Pacific urges the Court to follow *Jackson* and *Bingham* and reach the same result here.

Meza pushes back on Union Pacific's reliance on its past litigation success by highlighting some of its failures. *See Baker v. Union Pac. R.R.*, 580 F. Supp. 3d 647, 659 (D. Neb. 2022) (deciding Union Pacific regarded the plaintiff as disabled); *Sanders v. Union Pac. R.R.*, No. 4:20CV3023, 2021 WL 4783629, at *8 (D. Neb. Oct. 7, 2021) (similar). Meza contends he too has presented sufficient evidence "to raise a jury question" on his claim.

Meza acknowledges that to succeed on his disparate-treatment claim he must show that a perceived disability actually motivated Union Pacific's decision. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000). But he asserts he has met that burden because Union Pacific "removed [him] from service and imposed broad work restrictions for a period of five years because it believed [he] suffered 'severe traumatic brain injuries with intraparenchymal hemorrhages.'"

Meza relies on a comprehensive causation standard under which Union Pacific's reaction to his brain injury directly establishes that it discriminated against him "on the basis of disability." *See* 42 U.S.C. § 12112(a). Drawing on some prefatory language in *Bostock v. Clayton County*, 590 U.S. ___, ___ 140 S. Ct. 1731, 1745 (2020), Meza posits that "discriminating based on [a] protected characteristic is actionable even where employers 'don't perceive themselves as motivated by a desire to discriminate based on [that characteristic].'" *But cf. Anderson*, 78 F.4th at 1039 n.1 (declining to decide "whether the but-for causation standard outlined in *Bostock* . . . applies to ADA cases"). According to Meza, Union Pacific imposed work restrictions on him because of his brain injury and—subject to any provable defenses—is therefore liable for disability discrimination without the need for anything more.

This case raises some difficult questions. Both parties make points that resonate to some degree, but neither hits every note. They each suggest that the analysis is rather simple and patently falls in their favor, but some dissonance inevitably arises when their respective tunes are played to the end. Many of the issues the parties raise are fact-intensive. Such issues are rarely well-suited to blanket rules or simple conclusions. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999) (reiterating "the statutory obligation to determine the existence of disabilities on a case-by-case basis").

Meza's causation arguments make some sense and might hold more sway under different facts and circumstances. But on the record in this case, Union Pacific has the

stronger position.[4]  Focused primarily on arguing direct evidence and causation, Meza offers little response to Union Pacific's argument that it did not regard him as disabled as defined by the ADA when it imposed the work restrictions that left him unable to work. All but ignoring Union Pacific's cited authority on that issue, Meza says "there is no valid dispute that [Union Pacific] regarded Meza as disabled."  But he never adequately addresses Union Pacific's distinction between a current physical impairment and the potential risk of future health issues.

Meza relies on *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 480 (5th Cir. 2006), to show an employer's "admission that it did not hire the plaintiff because of a perceived disability was 'more than enough'" to establish liability on a disability-discrimination claim without a showing of hostility or ill will.  But unlike the employer in *Rodriguez*, Union Pacific does not admit it regarded Meza as having a current physical impairment when it took an adverse employment action against him—only that it feared the risk of future seizures.  As Union Pacific points out, Rodriguez's employer "specifically disavowed any reliance on the possible safety risks . . . as a basis for its decision to withdraw his job offer."  *Id.* at 479 n. 36.  Union Pacific has not done that here.

Meza's focus on his intracerebral hemorrhage also dooms his case.  As evidenced by Meza's testimony and the releases from his providers, that specific injury itself was no longer an issue when Union Pacific imposed the work restrictions.  *See Canning*, 995 F.3d at 615 (affirming summary judgment where the employee failed to show the employer regarded her as disabled when it took the adverse action).  The record includes undisputed evidence that Meza faced a greater risk of seizures after his brain injury and that Union Pacific acted based on that risk.  But that evidence is not necessarily probative

---

[4]That is not to say the Court finds all or even most of Union Pacific's legal arguments persuasive, or that the Court agrees—to the extent it applies at all in these circumstances—with the reasoning in Union Pacific's cited cases.  Again, these issues are intricate and fact-intensive.

17

evidence support for his assertion that Union Pacific thought he was disabled when it imposed the work restrictions on him. *See Morriss*, 817 F.3d at 1113 (distinguishing between a current physical impairment and a condition or physical characteristic that "may eventually lead to a physical impairment" in the future); *Bingham*, 2023 WL 6196875, at *13; *Jackson*, 2021 WL 1726895, at *14-*15.

Meza obviously sees things differently than Union Pacific, but he "must substantiate his allegations with 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation [or] conjecture.'" *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017) (alterations in original) (quoting *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)). As the Court sees it, Meza's perfunctory discussion of the implementing regulations and cursory conclusions about Union Pacific's motives likewise do not adequately address the issue. And he makes no effort to rebut the reasoning in *Morriss*, *Jackson*, and *Bingham* on this point.

In conclusion, to create a triable issue on his disparate-treatment claim, Meza was required, "as a threshold matter," to adduce sufficient evidence to show that—at the time it imposed the restrictions on Meza—Union Pacific perceived him to have an existing condition "that met the definition of 'physical impairment'" under the ADA. *Morriss*, 817 F.3d at 1113 Because he has not done that on the record in this case, his claim must fail.[5] *See O'Reilly v. Daugherty Sys., Inc.*, 63 F.4th 1193, 1196 (8th Cir. 2023) ("Upon motion and after adequate discovery, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Frosty Treats, Inc. v. Sony Comput. Ent. Am., Inc.*, 426 F.3d 1001, 1003 (8th Cir. 2005)); *Brown v. City of Jacksonville*, 711 F.3d 883, 890 (8th Cir. 2013)

---

[5]In light of the Court's conclusion that Meza has not "presented a submissible case of intentional discrimination," *Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014) (calling that "the ultimate question"), the Court need not reach the parties remaining arguments.

(affirming summary judgment because "the record [did] not contain evidence sufficient to permit a reasonable jury to find the [employer] terminated [the employee] based on any disability").

For that reason,

IT IS ORDERED:

1. Defendant Union Pacific Railroad Co.'s Motion for Summary Judgment (Filing No. 137) is granted.
2. This case is dismissed with prejudice.
3. A separate judgment will issue.

Dated this 26th day of January 2024.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge